## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Jacqueline Pfendler, on behalf of herself and all others similarly situated,<br><br>　　　　　　　　　Plaintiff,<br>　v.<br>PNC Bank, National Association,<br>　　　　　　　　　Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jacqueline Pfendler ("Plaintiff"), on behalf of herself and all others similarly situated, through the undersigned attorneys, files this Class Action Complaint ("Complaint") against Defendant PNC Bank, National Association ("PNC" or "Defendant"), and alleges the following:

### NATURE OF THE ACTION

1.　This action seeks to redress the unfair and deceptive practices committed by PNC in connection with its home mortgage loan servicing business. Taking advantage of the economic downturn and the increasing number of loans in default, PNC services home loans according to uniform practices designed to maximize fees assessed on borrowers' accounts when they are behind on their payments. Consistent with these practices, PNC uses automated mortgage loan management systems to engage in a deceptive and unfair scheme to collect fees for unnecessary, unreasonably, and inappropriate property inspections, a default-related service, cheating borrowers who can least afford them.

2.　Using an automated system, PNC orders drive-by property inspections whenever a borrower falls sufficiently behind on their payments. Until the borrower becomes current, PNC continues to order these inspections at regular intervals, and it charges borrowers a fee for each

inspection.

3. The only necessary, reasonable, or appropriate purpose of drive-by inspections is to determine whether a home is occupied. However, even when PNC knows that homeowners still occupy their homes and do not intend to abandon it, just because they are behind in payments, PNC continues to order and charge for property inspections.

4. This practice is directly contrary to standard form mortgage agreements for the mortgages PNC services, which only allow for default related services like property inspections only when they are necessary, reasonable, or appropriate. A drive-by property inspection is neither necessary, reasonable, nor appropriate, especially when it is automatically ordered without regard to whether PNC has information indicating that a property is not actually abandoned or vacant.

5. Such information might include, but is not necessarily limited to, knowledge on the part of PNC that: the borrower is making partial payments; the borrower is in contact with PNC; the borrower has made known to PNC that he or she does not intend to abandon or vacate the property; or that the borrower and PNC are working out a loan modification or other settlement of the outstanding amount due.

6. No reasonable consumer would ever enter into the mortgages serviced by PNC if he or she knew that it would order property inspections that are not necessary, reasonable, or appropriate in the event that the consumer has difficulty making their payments.

7. Nor would any reasonable consumer, when presented with a uniform and non-negotiable mortgage agreement serviced by PNC, understand or expect that PNC would order such unnecessary, unreasonable, and inappropriate property inspections given the limitations contained in those agreements that fees for services would only be assessed when necessary or reasonable.

8. When borrowers go into default and PNC unilaterally decides to instruct third

parties to perform unnecessary unreasonable, and inappropriate property inspections, borrowers have no ability to prevent such inspections, and they must pay the fees or face further consequences of being in default, such as eviction and foreclosure and escalating principle and interests costs.

9.    Plaintiff brings this action seeking injunctive relief and damages on behalf of herself and the hundreds of thousands or millions of borrowers who have been victimized by PNC's uniform practice of charging for unreasonable and inappropriate property inspection fees.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from PNC's citizenship, and (c) the matter in controversy exceeds $5 million, exclusive of interest and costs.

11.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because this is a judicial district in which PNC resides and because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## PARTIES

12.    Plaintiff Jacqueline Pfendler is a resident of Fayetteville, North Carolina.

13.    Upon information and belief, Defendant PNC is a national banking association, with a main office in Wilmington, Delaware listed in its articles of association, and its principal place of business in Pittsburgh, Pennsylvania.

## FACTS

14.    The servicing of mortgage loans, including loans serviced by PNC, has become largely automated in the United States. Accordingly, PNC automatically orders property

inspections using a computer system if an account has been in default for a specified period of time, and it continues to order inspections so long as the borrower remains in default.

15. Other factors are not considered, including whether a property inspection is necessary, reasonable, or appropriate under the circumstances.

16. Nor does the automated system consider whether a property inspection is permitted under the terms of mortgage documents. Instead, the process is conducted in a uniform and indiscriminate manner that captures all delinquent accounts.

17. Property inspections are even performed when PNC is aware that a property is not vacant, or where the property owner is in contact with PNC regarding efforts to resolve a delinquency.

18. Every month, borrowers are assessed fees for property inspections that are not necessary, reasonable, or appropriate.

19. At the time the fees are assessed, PNC knows that the property inspections were conducted, and that the fees were assessed without regard to whether an inspection is necessary, reasonable, or appropriate.

20. Those fees are listed in borrowers' monthly statements. When borrowers receive those statements, they have no reason to believe that they had been charged for services that were not necessary, reasonable, or appropriate and a reasonable borrower would not believe otherwise. Nothing in the statements indicates that borrowers had been charged for services that are not necessary, reasonable, or appropriate.

21. As the United States Bankruptcy Court for the Eastern District of Louisiana held *In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008), a bank's practice of using computer software to automatically trigger property inspections once a

borrower is a certain number of days in default -- and to continuously order those inspections thereafter until the default is cured -- is neither necessary nor reasonable as this practice is not designed to protect the lender's interest in the property. Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting the bank's bottom line.

22. That these computer-generated inspections are unnecessary, unreasonable, inappropriate, confer no benefit on the lender, and serve no discernible purpose other than to generate revenue for PNC is further evidenced by the limited nature of the inspections themselves. The property inspections ordered by Defendant's computer system are mere "drive-by" inspections, *i.e.*, the inspector "drives by" the property ostensibly to assess whether the property is occupied, being maintained, and has not been damaged -- a practice that provides no real opportunity to determine whether the lender's interest in the property is at risk.

23. Such a consumer-oriented business practice is inherently deceptive and unfair because borrowers are routinely and automatically assessed fees for services that are ordered without regard to whether there was any need or reason to perform such services in the first place. Regardless of whether they are necessary, reasonable, or appropriate, property inspections are automatically ordered and associated fees are automatically assessed to borrowers.

24. PNC profits off of these fees. To the extent the fees are the amounts charged to PNC by vendors that perform property inspections, PNC immediately assess fees against borrowers for the inspections, before a vendor can be paid. As a result, PNC profits from the "float" by collecting fees before paying vendors.

25. Also, when borrowers pay assessed fees, they are paying money that otherwise would be applied to the loan principal and accruing interest. As a result, interest continues to

accrue and compound with respect to that principal and interest that otherwise would have been paid down. This is yet another way PNC profits through this deceptive and unfair business practice because it results in the increase of borrowers' debts.

26. Reasonable consumers would not know at the time they sign such a mortgage agreement that they could be charged for such fees despite the fact the services may not be necessary, reasonable, or appropriate.

27. Before any borrower enters into a mortgage with PNC, they are presented, before they are asked to consummate the transaction, with uniform non-negotiable mortgage agreements that provide that default relates services will only be charged to the borrower when they are necessary, reasonable, or appropriate. Reasonable borrowers subject to a mortgage agreement that allow default related services like property inspections only when they are necessary, reasonable, or appropriate would believe that they would not be charged for such unneeded or unreasonable services. No reasonable borrower would understand that PNC would use an automated system to charge for inspections fees irrespective of whether the property is vacant, regardless of whether borrowers are making at least partial payments, whether PNC is in contact with borrowers who indicates that they intend on keeping the home and remedying the default, or whether PNC and the borrower are negotiating a loan modification or other resolution of the default.

28. Borrowers suffer monetary damages in the form of additional, unlawful debts assessed on borrowers' accounts. Borrowers have no choice but to pay these improper fees -- if they do not they risk losing their homes.

29. Moreover, the assessment of these fees can make it difficult if not impossible for borrowers to become current on their loans. Charges for default-related services drive borrowers further into default.

30. When borrowers get behind on their loan payments, and fees for these default-related services are stacked on to the past-due principal and interest payments, PNC's practices make it increasingly difficult for borrowers to bring their loans current.

**PNC Charged Plaintiff Unnecessary And Unreasonable Property Inspection Fees**

31. On or about December 9, 2011, Plaintiff and her husband purchased a home in Littleton, North Carolina. On that date, they executed a Deed of Trust mortgaging the property.

32. Plaintiff's mortgage lender was RBC Bank (USA). Upon information and belief, PNC acquired RBC Bank (USA) in 2012, and RBC Bank (USA) merged with and into PNC, leaving PNC as the surviving entity.

33. PNC is now liable for the obligations of RBC Bank (USA).

34. At all relevant times, PNC has serviced Plaintiff's mortgage and continues to do so.

35. The Deed of Trust is a form instrument issued by Fannie Mae and Freddie Mac for use with the mortgaging of single family homes in North Carolina.

36. Fannie Mae and Freddie Mac issue substantially similar form instruments for all fifty states and the District of Columbia.

37. Upon information and belief, PNC utilizes such Fannie Mae and Freddie Mac form instruments for all residential mortgages in the United States.

38. The Deed of Trust provides that:

> If (a) Borrower fails to perform the covenants and agreements contained in this Security Agreement, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Agreement (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over the Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Agreement, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

39. Substantially similar language appears in the Fannie Mae and Freddie Mac form instruments for each state and the District of Columbia.

40. After over five years of regular payments, in 2017, Plaintiff began facing difficulty making regular mortgage payments every month.

41. As of July 2017, Plaintiff was current on her mortgage obligations. However, her next payment (which included the payment of a late charge) did not occur until September 7, 2017.

42. Plaintiff was in communication with PNC during this time. PNC knew or should have known that Plaintiff had not abandoned the property and was attempting to become current on the loan.

43. Nevertheless, on or before October 23, 2017, PNC ordered a property inspection for the home. Plaintiff was assessed a $15 fee for the inspection.

44. This property inspection in no way helped to "protect Lender's interest in the Property and rights under this Security Agreement" and the ordering of the property inspection for such purpose is not necessary, reasonable, or appropriate.

45. For this reason, PNC had no contractual right to assess a fee for the property inspection.

46. Plaintiff then made a payment on November 1, 2017. Such payment indicates an intent not to abandon the property, as well as an intent to pay mortgage obligations.

47. However, another property inspection was ordered by PNC on or before November 20, 2017. Plaintiff was assessed another $15 inspection fee on November 20, 2017. This was less than one month after the last property inspection.

48. This second assessment of a fee for a property inspection was also not a necessary, reasonable, or appropriate means to "protect Lender's interest in the Property and rights under this Security Agreement" for the same reasons.

49. Not only was Plaintiff making payments, but she was in contact with PNC.

50. Among other things, on a statement dated November 1, 2017, PNC incorrectly asserted that Plaintiff had filed for Bankruptcy. Plaintiff has never filed for bankruptcy and had to explain the error to PNC.

51. Further, on or about September 17, 2017, Plaintiff submitted a hardship assistance request to PNC, further demonstrating an intent to become current on the loan and not to abandon the property.

52. On November 30, 2017, Plaintiff made a payment that was credited to one of the outstanding property inspection fee charges.

53. On March 2, 2018, Plaintiff made a payment that was credited to the other property inspection fee charge.

## CLASS ACTION ALLEGATIONS

54. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action against PNC as a class action on behalf of herself and all members of the following nationwide class: All mortgagors in the United States of a mortgage entered into, assigned to, owned by, or serviced by PNC who were charged a fee for property inspections (the "National Class")

55. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action against PNC as a class action on behalf of themselves and all members of the following subclass: All North Carolina residents who are mortgagors of a mortgage entered into, assigned to, owned by, or serviced by PNC who were charged a fee for property inspections (the "North Carolina Class").

56. All of the members of the classes and sub-classes are collectively referred to as the "Class" or "Class Members."

57. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether class certification is appropriate.

58. Excluded from the Class are: (i) Defendant and any entities in which Defendant has a controlling interest; (ii) any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant; (iii) the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; and (iv) all governmental entities.

59. The members of the Class are so numerous that their joinder is impracticable.

60. All members of the Classes have been subject to and affected by the same practices and policies described herein. There are questions of law and fact that are common to the Classes and which predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to, the following:

    a. Whether Defendant engaged in a uniform practice of deceptively and unfairly assessing fees against borrowers for services that were unneeded and unreasonable;

    b. Whether Defendant engaged in a uniform practice that violated that the terms of uniform mortgage agreements;

    c. Whether Defendant's unlawful, deceptive, and unfair practices harmed Plaintiff and the Classes;

    d. Whether the Court can enter declaratory and injunctive relief; and

    e. The proper measure of damages.

61. The claims of the named Plaintiff are typical of the claims of the Classes and do

not conflict with the interests of any other members of the Classes in that the Plaintiff and the other members of the Classes were subject to the same wrongful policies and practices by Defendant.

62. The individually named Plaintiff will fairly and adequately represent the interests of the proposed Classes. She is committed to the vigorous prosecution of the Classes' claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions.

63. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for the parties opposing the Classes. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the Classes.

64. The Defendant has acted or refused to act on grounds generally applicable to the Classes, making final declaratory or injunctive relief appropriate.

65. The Classes are easily ascertainable as Defendant's computerized records can identify all mortgagors who paid property inspections.

66. The questions of law and fact common to members of the Classes predominate over any questions affecting only individual members.

67. Notice to the proposed Classes can be achieved through the U.S. mail to the addresses of the Class members that are kept within Defendant's records.

68. A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

    a. Individual claims by the members of the Classes are impractical as the costs

       of litigation far exceed what any one individual plaintiff has at stake;

    b.    As a result, individual members of the Classes have no interest in prosecuting and controlling separate actions;

    c.    It is desirable to concentrate litigation of the claims herein in this forum;

    d.    The proposed Classes are manageable.

69. Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
**On Behalf of The National Class And The North Carolina Class**

70. Plaintiff repeats and realleges all the foregoing allegations as if they were fully set forth herein.

71. Plaintiff and members of the Class entered into mortgage agreements with substantially similar language providing that PNC would only charge for default-related services like property inspections when they are needed or reasonable.

72. PNC breached these mortgage agreements by assessing fees against Plaintiff and the Class members for property inspections that were not necessary, reasonable, or appropriate.

73. As a result of this breach of contract, Defendant has caused and continues to cause injury to Plaintiff and the Class members who were assessed fees for property inspections that were not necessary, reasonable, or appropriate.

74. PNC has also breached its duty of good faith and fair dealing. Mortgagors like Plaintiff reasonably expected that PNC would use discretion with respect to ordering and charging for property inspections in good faith and that it would only order such inspections when they were

necessary, reasonable, or appropriate.

75. Defendant frustrated those expectations by ordering property inspections using an automated system without discretion or by abusing discretion to order inspections that were not necessary, reasonable, or appropriate. Mortgagors like Plaintiff would not have entered into their mortgages with PNC if they knew their reasonable expectations with respect to default–related services (namely that they would only be ordered when necessary, reasonable, or appropriate) would be frustrated.

76. As a result of the foregoing, Plaintiff and the Class members are entitled to their actual damages.

77. Plaintiff and the Class members are also entitled to injunctive, equitable, and declaratory relief, including an injunction barring PNC from committing future breaches of its contractual obligations.

## SECOND CLAIM FOR RELIEF
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
(73 P.S. §§ 201-1, *et seq*.)
On Behalf Of The National Class**

78. Plaintiff repeats and realleges all the foregoing allegations as if they were fully set forth herein.

79. Plaintiff brings this action on behalf of herself and the National Class against Defendant.

80. Plaintiff and all Class members are "persons" within the meaning of 73 P.S. § 201-2(2).

81. Defendant's principal place of business is in Pennsylvania.

82. Upon information and belief, Defendant's policies and procedures pertaining to mortgage servicing are set in Pennsylvania.

83. Defendant engaged in unfair and/or deceptive acts or practices relating to the imposition of charges for unnecessary, unreasonable, or inappropriate property inspections, in violation of the UTPCPL, 73 P.S. § 201-1, *et seq.*

84. 73 P.S. § 201-3 prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade of commerce."

85. 73 P.S. § 201-2(4)(xxi) defines "unfair methods of competition" and "unfair or deceptive acts or practices" as "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."

86. Pursuant to 73 P.S. § 201-9.2, Plaintiff and members of the Class purchased banking and mortgage services from Defendant that were used primarily for personal, family, or household purposes.

87. Defendant engaged in unlawful conduct or otherwise violated the UTCPCL by, *inter alia*, knowingly misrepresenting and intentionally omitting material information regarding the nature of the fees that would be assessed to borrowers' accounts for unnecessary, unreasonable, and inappropriate services, including property inspections.

88. Despite knowledge that the property inspections were unnecessary, unreasonable, and inappropriate, Defendant concealed the fact that defaulting borrowers would be automatically and repetitively charged for such services.

89. Defendant acted deceptively by presenting borrowers with mortgage agreements that misleadingly and deceptively indicate that borrowers will not be charged for unnecessary, unreasonable, and inappropriate services.

90. Defendant did so, despite knowledge that borrowers in default would be automatically and repeatedly charged for unnecessary, unreasonable, and inappropriate services.

91. Defendant's unfair and deceptive acts or practices deceive reasonable consumers into believing that they would only be charged for necessary, reasonable, or appropriate property inspections.

92. Those fees are listed in borrowers' monthly statements. When borrowers receive those statements, they have no reason to believe that they had been charged for services that were not necessary, reasonable, or appropriate and a reasonable borrower would not believe otherwise. Nothing in the statements indicates that borrowers had been charged for services that are not necessary, reasonable, or appropriate.

93. Regardless of the terms of any applicable mortgage agreement, Defendant also engaged in fraudulent and deceptive conduct by engaging in a practice of automatically and repeatedly assessing fees for property inspections against borrowers in default without regard to, or consideration of, whether those services were necessary, reasonable, or appropriate.

94. Defendant did so through an automated computer system that only looked to whether an account was in default, and did not consider whether a property inspection would otherwise be necessary, reasonable, or appropriate.

95. Defendant's conduct caused Plaintiff and Class members to suffer ascertainable losses in the form of excessive property inspection fees, that, but for Defendant's unfair and

deception policy and practice of conducting unnecessary, unreasonable, or inappropriate property inspections, would not have otherwise been imposed.

96. Plaintiff and Class members are entitled actual damages or one hundred dollars ($100), whichever is greater. Plaintiff and Class members are further entitled to have their actual damages trebled to an amount of not less than one hundred dollars ($100).

97. Plaintiff and Class members are further entitled to their costs and reasonable attorney fees.

98. Plaintiff and Class members also seek an order enjoining Defendant's unfair, unlawful, and deceptive practices, declaratory relief, and any other necessary or proper relief available under the Pennsylvania Consumer Protection Act.

### THIRD CLAIM FOR RELIEF
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act
(N.C. Gen. Stat. Ann. § 75-1.1, *et seq*.)
On Behalf Of The North Carolina Class**

99. Plaintiff repeats and realleges all the foregoing allegations as if they were fully set forth herein.

100. The North Carolina Unfair and Deceptive Trade Practices Act prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. Ann. § 75-1.1.

101. Defendant is engaged in "commerce" within the meaning of N.C. Gen. Stat. Ann. § 75-1.1.

102. PNC has engaged in unfair or deceptive conduct.

103. Defendant knowingly misrepresented and intentionally omitted material information regarding the nature of the fees that would be assessed to borrowers' accounts for unnecessary, unreasonable, and inappropriate services, including property inspections.

104. Despite knowledge that the property inspections were unnecessary, unreasonable, and inappropriate, Defendant concealed the fact that defaulting borrowers would automatically and repetitively be charged for such services.

105. Defendant acted deceptively by presenting borrowers with mortgage agreements that misleadingly and deceptively indicate that borrowers will not be charged for unnecessary, unreasonable, and inappropriate services.

106. Defendant did so, despite knowledge that borrowers in default would be automatically and repeatedly charged for unnecessary, unreasonable, and inappropriate services.

107. Defendant's unfair and deceptive acts or practices would deceive a reasonable consumer into believing that they would only be charged for necessary, reasonable, or appropriate property inspections.

108. Those fees are listed in borrowers' monthly statements. When borrowers receive those statements, they have no reason to believe that they had been charged for services that were not necessary, reasonable, or appropriate and a reasonable borrower would not believe otherwise. Nothing in the statements indicates that borrowers had been charged for services that are not necessary, reasonable, or appropriate.

109. Regardless of the terms of any applicable mortgage agreement, Defendant also engaged in deceptive conduct by engaging in a practice of automatically and repeatedly assessing fees for property inspections against borrowers in default without regard to, or consideration of, whether those services were necessary, reasonable, or appropriate.

110. Defendant did so through an automated computer system that only looked to whether an account was in default, and did not consider whether a property inspection would otherwise be necessary, reasonable, or appropriate.

111. Plaintiff and Class members were injured as a result of Defendant's conduct in violation of the North Carolina Unfair and Deceptive Trade Practices Act.

112. Plaintiff and Class members are entitled to actual damages to be trebled, together with their costs and reasonable attorney fees.

113. Plaintiff and Class members also seek an order enjoining Defendant's unfair, unlawful, and deceptive practices, declaratory relief, and any other just or proper relief available under North Carolina law.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### On Behalf Of The National Class And The North Carolina Class

114. Plaintiff repeats and realleges all the foregoing allegations as if they were fully set forth herein.

115. Plaintiff and the members of the Classes conferred a benefit upon Defendant in the form of fees for unnecessary, unreasonable, and inappropriate property inspections and any interest accruing on such fees.

116. Defendant received this benefit with an appreciation or knowledge of the benefit.

117. Defendant accepted and retained the benefit under circumstances that make it inequitable for the receiving party to retain the benefit.

118. Defendant was unjustly enriched.

119. As a direct and proximate result of Defendant's unjust enrichment Plaintiff and Class members have suffered injury-in-fact and/or actual damages.

120. As a result, Plaintiff and the Class Members are entitled to a disgorgement of all amounts by which Defendant has been unjustly enriched, as well as their actual damages, punitive

damages, reasonable attorney's fees and costs, and injunctive, declaratory, and equitable relief barring future unlawful conduct by Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment against Defendant as follows:

A. Certifying this action as a class action, with Classes as defined above;

B. Requiring that Defendant pay for notifying the Class members of the pendency of this suit;

C. Awarding Plaintiff and the Classes all injunctive, declaratory, and equitable relief to which they are entitled;

D. Awarding Plaintiff and the Classes monetary damages in an amount to be determined at trial, together with pre and post-judgment interest;

E. Awarding Plaintiff and the Classes statutory damages in the maximum amount provided by law;

F. Awarding Plaintiff and the other Classes members the reasonable costs and expenses of suit, including their attorneys' fees; and

G. Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims for relief in this action.

Dated:  March 20, 2018		Respectfully submitted,


By:  *s/ Edwin J. Kilpela*
Edwin J. Kilpela
Elizabeth Pollock-Avery
**CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Fax: (412) 231-0246
ekilpela@carlsonlynch.com
eavery@carlsonlynch.com

D. Greg Blankinship (*pro hac vice* forthcoming)
Bradley F. Silverman (*pro hac vice* forthcoming)
**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**
445 Hamilton Ave, Suite 605
White Plains, New York 10601
Telephone:  (914) 298-3281
Fax:  (914) 908-6709
gblankinship@fbfglaw.com
bsilverman@fbfglaw.com

*Counsel for Plaintiff and the Classes*